This is a video of the Grubhub Holdings, Inc. website. The website is www.grubhub.com.  The website is www.grubhub.com.  The website is www.grubhub.com. The website is www.grubhub.com. The website is www.grubhub.com.   The website is www.grubhub.com. The website is www.grubhub.com. The website is www.grubhub.com.     The website is www.grubhub.com. Good morning, ladies and gentlemen. The first case this morning is Carman Wallace v. Rupert. Thank you. Good morning, Your Honors. I'm Shannon List Riordan. I represent the plaintiffs in these consolidated matters, Wallace and Soran v. Grubhub. The issue before the court today is whether or not the plaintiffs in these cases fall under the Section 1 Transportation Worker Exemption to the Federal Arbitration Act and, therefore, whether the district courts below erred in compelling arbitration in these cases. So, before I get into the meat of this argument, I want to start by emphasizing what both district courts below recognized and acknowledged. That is that the issue in this case does not turn on whether or not the plaintiffs themselves are delivery drivers for Grubhub. The question is whether they are transportation workers who are engaged in interstate commerce. The question does not turn on whether or not these drivers themselves actually crossed state lines. There is a wealth of case law that says that the issue is whether or not the goods being transported crossed state lines, and every circuit to have addressed this question has acknowledged that the workers themselves don't have to cross state lines. Well, that's not quite right, though. The focus isn't entirely on the goods because it's not in Section 1. The focus is whether the plaintiffs belong to a class of transportation workers. Correct. And maybe they don't have to actually cross state lines themselves. Correct. But if it's part of the duties of the class of workers to which they belong. No, no. So, what I'm saying is that every circuit to have actually addressed this question has acknowledged that the workers, not even any of the members of the class, need to cross state lines. The question is whether they're engaged in interstate commerce, whether the goods that they handle are in interstate commerce. No, that's not how I read the cases. Why don't you explain why you read the cases that way? Yes, okay. So, for example, in the Third Circuit Palco case, that involved a supervisor of delivery drivers. The supervisor obviously didn't cross state lines herself. In the Eleventh Circuit Postal Workers case. But that was because she was closely involved. I mean, the Third Circuit used a nexus test there. And also, we're not the Third Circuit. Correct. But I'm going to go through the various circuits. So, in the Palco case, also, the district courts below misread the Palco case. And thought that the supervisor there supervised delivery drivers who themselves crossed state lines. But a close reading of that case shows, and some of the other cases have acknowledged that, those delivery drivers were only intrastate drivers who transported goods within the Philadelphia area. It was the goods that crossed state lines, not the drivers themselves. So, it's a very important misreading by the district court of the Palco case. The Sixth Circuit by Kashiwa versus U.S. Postal Service case. Also, it involves postal employees who did not, none of the class crossed state lines. But the goods, their mail, U.S. mail, was considered to be a good in interstate commerce that crossed state lines. The Fifth Circuit, the Eleventh Circuit also has a postal worker case that says the same thing. But it was the member, I mean, in that postal worker case, what the court pointed out was that, you know, it's hardly, one can hardly think of an industry that's more involved in sending things across state lines than the Postal Service. And so, the workers in that enterprise were engaged in that, which is different than the Grubhub delivery. Okay, exactly. But for the point that I'm making, the drivers themselves, the postal workers themselves, none of them had to cross state lines. The analysis was whether or not what they were carrying crossed state lines. So, I'll come back in a moment. The analysis was how close the particular plaintiff in the case was connected to the workers who actually did drive themselves across state lines or fly things across state lines. Right, right. There's the case with the airport security inspector. Right, okay. And again, in the postal worker cases, the postal workers themselves, none of the class crossed state lines. It was the mail that crossed state lines. So, I'm going to come back in a moment to why the food ingredients crossed state lines. But my point now is simply that the class of drivers don't need to have crossed state lines. Well, let me give you a hypothetical then that involves a package or a passenger that's crossed state lines. So, let's imagine I live just a few blocks away from Notre Dame, and on football weekends there are tons of bike taxis that will transport people back and forth from where they park their car up to the football stadium. Those bike taxi drivers are transporting people who have flown from all over the country to come to the game. Are they interstate transportation workers for purposes of Section 1? I don't know. On the spot, I'm not sure about the facts of that case in particular. Well, why would it be different? The passengers have crossed state lines just like, you know, the coconut milk or the, you know, the fruit or whatever the Grubhub drivers are driving. But through a process that's not tied to the bike taxi driver, just like Grubhub isn't participating in the actual transport of the oranges across state lines that might wind up in someone's lunch. Well, they very well, I guess the question is, I'm not arguing that case, but they very well may. They very well may. It seems to me like your theory would say that it does, so that the bike taxi driver is exempt or the bike taxi driver that carries passengers that have flown from Washington State to Notre Dame to see a football game are then exempt. Yes, they may be, yes. Okay. Okay. So I want to focus for a moment on the Seventh Circuit case, the Teamsters case. What was crucial in that case was that the plaintiffs hadn't even raised an argument about whether they had crossed state lines. The Seventh Circuit noted that if you do cross state lines or if someone in the class crossed state lines, then you're in interstate commerce, then you're engaged in interstate commerce. But the court didn't say that it was necessary that they cross state lines. But in that case, the plaintiffs hadn't even made an allegation that they crossed state lines. And the Seventh Circuit on its own, because it has the requirement to determine its own jurisdiction, on its own said, look, some of these drivers were operating near the border of Illinois and Indiana. We assume that some of them occasionally crossed state lines. That the drivers themselves crossed state lines. And on remand, the two drivers testified in the evidentiary hearing that, in fact, they had driven products across state lines, and the focus was on what the drivers did. Okay. Exactly. So here we have Grubhub, which is a national company. We have 7,000 drivers from 45 states who have opted into the Soran case. If the court were to remand it, as the Teamsters court did, to determine whether any of those 7,000 drivers ever crossed a state line, I guarantee you that someone has. Well, why didn't the plaintiffs make that allegation below? Well, in the Teamsters case, the plaintiffs hadn't made the allegation. But that was a jurisdictional thing that the court noticed to Esponte. Correct. And that's on the books now, right? So the plaintiffs should have below, or you could have sought to amend the complaint, even made an allegation that some Grubhub drivers, for example, you know, from Washington, D.C. to the Maryland suburbs crossed state lines. Right. I believe that it is in the briefing below there was discussion about whether they may have ever done so. We agree with Grubhub that it shouldn't be necessary to get into that detailed type of discovery at the outset. But I'm just noting that in the Seventh Circuit, that's exactly what the court did. And it determines that that analysis may need to be done. And we did put in our papers that if the court has any question about that, it could order discovery to see whether any of the 7,000 drivers ever once crossed a state line. Because you have here a national company the size of Grubhub, I think it can be inferred that, and in fact, under the standard, under the 12B3 standard, the court is not limited to what's in the pleadings. It's based on reasonable inferences as well. It can be inferred that at least one of the 7,000 drivers who opted into this case around the country at some point drove across state lines. If the court has any question about that, like the court did in the Teamsters case, it could remand for us to find such a driver and have that analysis. But I don't even think Grubhub is denying that some driver somewhere out of the 7,000 at some point crossed state lines. So under the Teamsters case, we should win on that alone. But if I can continue the argument that I was making, my point is that every circuit that has addressed the question on the sole question of whether the drivers themselves have to cross state lines have held that you look at the goods. It doesn't have to be the drivers. In addition to all the circuit courts I just described, well, you have the Ninth Circuit Hardin v. RPS case where RPS were local truck drivers. That's the predecessor to FedEx. They were making local deliveries. The exemption was found to be applied there. In the Lenz case, even though that plaintiff was not found to fall under the exemption, the Eighth Circuit acknowledged that the worker themselves, the plaintiffs themselves, didn't have to cross state lines. You have the Nieto case from the California Court of Appeals, which says this explicitly, and you have numerous district court cases, Christie v. Loomis, Rittman v. Amazon, Wythaka v. Amazon, Ward v. Express Messenger. All of these cases have recognized that back in 1925, when Congress enacted the FAA and the transportation worker exemption, at the time, you look at what Congress thought engaged in interstate commerce meant at the time, and these cases have recognized and acknowledged that, at the time, engaged in interstate commerce didn't require the actual worker to cross state lines. We've cited to you some FILA cases, which use the exact same language. A 1924 case from the United States Supreme Court, the Birch case, was essentially the original gig economy case. That was a case involving railroads would come and bring cargo across state lines, and then they hired local people at the station to unload the vehicle, to unload the cargo. And in the Birch case, the U.S. Supreme Court held that that worker was engaged in interstate commerce, even though he never crossed state lines, because he was unloading cargo that the train had brought across state lines. The 1920 Hancock case is similar, where the workers were loading coal intrastate. They didn't cross state lines, but the coal was just being brought in. Counsel, do you lose, if we disagree with you, I mean, if, you know, the test, for example, that the Sixth Circuit has articulated is not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce. Do you lose, if we think? I mean, I agree with you that whether goods have moved across state lines is a useful proxy for whether the worker himself has moved them across state lines. So, I think, you know, to the extent that cases describe that, I don't think the focus is on the goods, the focus is on the worker, but watching the movement go across state lines indicates what the worker does. Do you lose, if we disagree with you, and think the focus is on the worker and not the goods? Okay, well, so two points. One is, all of the cases I've just cited have recognized that the workers themselves don't have to cross state lines. Okay, well, if we disagree with that, do you lose? And the Teamsters case in the Seventh Circuit said that even if a small portion of them, even if a handful cross state lines, that's enough, and you can remand. And we told the courts below that we could do discovery on this if that were crucial, and the courts didn't pick up on that. But there's also the issue about the food crossing the state lines. And if I—I've reserved five minutes. I'm not sure if this means I have eight minutes left. You have eight minutes left. I have eight minutes, and then I still have my five-minute rebuttal? I reserved five minutes. I'll let the presenter— I don't know. Is five minutes in the 18? Oh, okay. All right. So if I can just quickly get to my other points here. The food, none of—neither of the courts below analyzed whether—really analyzed whether the food was in interstate commerce. They just—I have distinctions for both the cases, but because my time is running short, there was no analysis of the fact that indisputably some of the food items that the drivers transported were not transformed at all. Chips and sodas, obviously, were—crossed state lines, and it wasn't like a restaurant cooked them into a meal. There was no analysis of this. And even in the Seventh Circuit Dean Milk case from 1968, that case recognized that even where some of the ingredients came from out of state and there was some processing of the ingredients, that didn't break the chain of interstate commerce. And importantly, the Scardino case, 1972, Westlaw 498, relies on Dean Milk to say the issue shouldn't be how much the food was processed. Here, there wasn't even an—and it relies—it says that Scardino—Scardino says that Dean which Grubhub relies on, and that it makes no sense to have to have the question turn on how much processing there was. Here, there was no analysis of the fact that there's some food items that weren't processed at all. Some food items, like carrots, might have been processed from raw carrots to steamed carrots. But should the case really turn on the question of whether that broke the interstate journey? And I would suggest to you that it didn't. Another important point that I want to raise, and that neither of the courts below really raised, is the discussion about the interplay between Section 1 and Section 2 of the FAA. So, a number of the cases talk about—and Grubhub talks about the fact that commerce, as used in Section 2, is a broader commerce than the engaged in commerce language used in Section 1. We realize that. We understand that. Section 2 commerce goes to the outer bounds of congressional constitutional authority to legislate. In most of the cases—the cases all say that Section 2 commerce is broader than Section 1 engaged in commerce, but none of them grapple with what does that really mean. And here's what I suggest that really means. So, for example, in the Lenz case, you had a customer service agent who worked for a transportation company. And the court held that although the company was in commerce, the business affected commerce for purposes of Section 2, the customer service agent wasn't closely tied enough to that to be engaged in commerce for purposes of Section 1. And the Lenz court cited another couple of examples. For instance, a case in which— Counsel, you're asking us to construe that language, the commerce language in Section 1, really practically consistently with the reach of Congress' commerce power. And that is not what—Circuit City rejects that quite squarely. Yes, but what I'm saying here is that in this case, they are the same. That's not true in all cases. But in this case, if Grubhub affects commerce— Counsel. It's only— Counsel, you're in your rebuttal time. Yes, if I could just make this one— You can go ahead. Okay, I just want to make this one point quickly. If Grubhub affects commerce, it is because the delivery of food items, the food items are in interstate commerce. It's the same question here as to whether or not the plaintiffs are engaged in interstate commerce. So this isn't like a case where a railroad—the question is whether the customer service person is engaged in the commerce that the railroad is clearly engaged in. Here, it's the same inquiry. Grubhub only affects commerce if these food ingredients are in interstate commerce. So it's the same question for Grubhub and for the drivers. So in other cases, it's not going to be the same question. But here, the only way that Grubhub affects commerce is if these food ingredients traveling across state lines constitutes commerce. Which is true of almost anybody who drives anything as part of their employment anywhere around two blocks away. Things have traveled. Some component of the pencil or the folder or whatever has traveled in interstate commerce. It's not just about Grubhub. It's about the scope that you're asking. Right, right. But I'm just saying that in this case, how does Grubhub affect commerce unless the movement of these food items constitutes commerce? It's different from the train cases, for example. And in the new prime case, the Supreme Court said that Section 1 and 2 needs to be read in relation to one another. I'll reserve the rest of my time. I did just want to note also that if the court finds that the FAA does not apply, Grubhub waived trying to apply state law because they didn't ask for it in their motions. And I cite Hardin v. RPS from the Ninth Circuit for that. And I'll reserve the rest of my time. Thank you. Thank you. May it please the court. Good morning. I'm Rob Pritchard with Josh Vaughn on behalf of Grubhub. Plaintiffs were engaged in the local intra-city delivery of meals prepared by local restaurants and delivered to local diners. Meals often delivered on foot or by bicycle. The plaintiffs do not belong to a class of workers akin to seamen or railway workers who are actually engaged in the movement of bulk goods in interstate commerce and as to which Congress had developed dispute resolution protocols designed to avoid mass disruption to our national economy as a result of strikes that could not be resolved through alternative dispute resolution protocols. Counsel, do you agree with your opposing counsel that all of the cases from other circuits focus on the goods rather than the transportation of worker? Quite the opposite. The cases say specifically we have to ask what is the class of workers actually engaged in. International Brotherhood in this circuit specifically says we have to look at the class of workers and whether they are in fact crossing state lines, whether they in fact are engaged in interstate commerce by transporting goods across state lines. And in that particular case, the entire class of workers, truckers, crossed state lines albeit only occasionally and that was sufficient because of the facts of that case. The truckers belonged to the class of workers akin to seamen and railroad workers. So in this case, if we agree with your reading of the cases, do you think plaintiff has asked for remand to find out if any of the 7,000 members of the class of Grubhub workers crossed state lines? Do you agree with that? No. International Brotherhood was a jurisdiction appeal. The defendant had moved to compel arbitration. That motion was denied. The defendant attempted to take an interlocutory appeal from that judgment and the court of appeal said before we get to the merits, we have to first assess our appellate jurisdiction. When assessing appellate jurisdiction, the standard jurisdiction that applies in this case, appeal from a final judgment dismissing the action, did not apply in that case because the order denied the motion to compel arbitration. The defendant alternatively argued that under section 16 of the FAA, appellate jurisdiction could lie from the denial of a motion to compel arbitration. And so the court of appeals was tasked with deciding whether the FAA applied at all because if it didn't, then section 16 would not provide that basis. So the court sui sponte said we have a jurisdictional obligation to find out. This case is completely different. In this case, the plaintiff has the burden. The plaintiff had the ability to attempt to prove that they belonged to a class of workers engaged in interstate commerce akin to railroad workers and seamen. They did not attempt to do that. They've disclaimed any attempt to do that. They've disclaimed that that even should be the test. They want the flow of goods test to be applied in this case, and I'll get to that in a minute as to why that's the wrong test to apply. And even if it is the right test, it doesn't apply to this case given the change of the products in interstate commerce when they get to the restaurant. Do you concede, given our precedents that require only occasional interstate crossings by the class of workers, not regular crossings, that if members of this class of Grubhub workers do occasionally cross state lines, that indeed the section 1 exemption would apply? So, for example, somebody running, you live right on the border, running across to deliver food from, you know, eastern Illinois into western Indiana. Sure. I'd first say that that is not on the record below, and this court should affirm the judgment of the district court. If the plaintiffs fail to create an evidentiary record, fail to file a motion for discovery, failed in opposition to our motion to compel to try to introduce evidence that that even happened occasionally, it's waived, and this circuit should not, they need to decide the case on the record that it's given. But to answer your question, the answer is still no, because section 1 applies to the, it asks about the class of workers. It doesn't ask about the FLSA, the scope of the FLSA certification order. It doesn't ask about a Rule 23 class with regard to employees of a particular employer. The test in section 1 is whether the class of workers, like seamen, like railroad workers, not like railroad workers for B&O Railroad, railroad workers as a national collective of workers in our nation, are they engaged in interstate commerce? In international brotherhood, it wasn't just a few drivers who crossed state lines. The class of truck drivers engaged in shipping the concrete crossed state lines. The class crossed state lines only occasionally, but the entire class was, that was something that could be expected of them. Well, but that wasn't the court's focus, and nor was it, the name of the case is escaping me, but the prior case that we had, the court relied on two, the testimony of two workers that, yeah, we had driven from East St. Louis across the border. Yeah, the evidentiary finding was that the class of truck drivers could be called upon to cross state lines into Missouri, and so that was the finding there. I think, frankly, there was a bit of an error there because they looked at the class, the Rule 23 class essentially, the employees subject to the collective bargaining agreement rather than the class of workers to which they belong, which is broader than the employer and extends to truck drivers who cross state lines. So the industry, the... Sure, and that's what Congress did in 1925. Again, we have to go back to the purpose of the statute. Even this circuit's precedent teaches, and the Circuit City tells us, let's go back and look at why Section 1 exists. Section 1 does not exist because Congress wanted to arbitrarily exclude certain categories of workers from arbitration. Congress, to the contrary, as the court recognized just a few weeks ago in the Facebook case, said that there's a liberal policy favoring arbitration as evidenced by Section 2's reach to the fullest possible extent of the Commerce Clause. Section 1 was an exception that was designed because Congress had already developed robust alternative dispute resolution protocols for the class of workers in the mercantile industry, for the class of workers in the railroad industry. And those people had those dispute resolution protocols in place so that they could resolve their disputes, avoid the mass strikes, avoid the disruption to the nationwide economy. So that is the test when we expand it to look at the residual clause of the workers who are other workers, other classes of workers who are engaged. So how is this class defined? I would define the class as local couriers of local food delivery. Local couriers. And local couriers existed in 1925. There were people who delivered newspapers. There were people who delivered food on foot. Within a community. And they were not of the type of worker that Congress was concerned about in 1925, creating a mass disruption to the economy by deciding not to deliver someone their apple or their sandwich. That is not what Congress was concerned about. So we look to the fundamental purpose of the FAA. Section 2, broad. Everyone should be covered. Section 1, narrow exception for those workers who Congress has indicated an interest in So in this particular case, even if we define the class as grub hub delivery drivers, we still find that the class of workers is not engaged in interstate commerce, even if one or two of them or some of them might occasionally cross over a state line given the nature of their local community being near a state border. Because the class overall will not be expected to cross state lines. There's no evidence in the record, by the way, of any of this. And since it's plaintiff's burden to establish, this is all hypothetical. But if that record had been established, that of the thousands and thousands of individuals who have delivered food from a local restaurant to a local diner and happened by happenstance to cross a state line in that one-mile bicycle ride, that person is not among a class of workers where that class of workers is expected to be engaged in interstate commerce. We also, again, have to look at the purpose of the statute when it was enacted in 1925. Congress was concerned about mass disruption. They were concerned about seamen. They were concerned about railroad workers. If they went on strike because they didn't have a dispute resolution procedure in place, then the economy would be disrupted. So we're talking about bulk transfer of goods was the concern of Congress, and that's what they were concerned about. They were not concerned about the happenstance of one person who might have occasionally strayed across a state line. That would eviscerate the rule. It would grow the exception to the point where there is simply no one left for Section 2. What about the last leg, Amazon Deliver? Every case to have considered the issue, both the Amazon cases in the district courts as well as all of the cases involving either food or meal delivery or other courier services have found that the cases are distinguishable. They've all relied in finding that distinction on the flow of goods issue. They say, pursuant to the cases dating back to Walling from the 1940s, if we're going to adopt a flow of goods test, which some of the courts have done and for which we say it does not apply in this case, but if it applies, the flow of goods has to stop somewhere. In Walling, the United States Supreme Court said that it stops when it reaches the local merchant that purchased the good. So when the merchant purchases the good that traveled in interstate commerce to get to the merchant and changed ownership at the merchant, the flow of interstate commerce comes to an end. And anything that happens after that between the merchant and the merchant's customers is intrastate commerce. And so in this particular case, even if the courts of appeals of the First Circuit and the Ninth Circuit were to affirm the district courts in those Amazon cases, finding that the last mile delivery driver was engaged in the flow of commerce, if that's the test that they choose to apply, that still does not change the outcome in this case because in this case it is undisputed that the restaurants, the local restaurants purchased the food, purchased all the ingredients. There's no evidence in the record as to where they purchased the ingredients from. The plaintiff speculates that there are purchases that occur over state lines, but there is nothing in the record. The plaintiff, with the burden, did not establish this as a factual evidentiary matter. But let's assume that it's reasonable to assume. I think it's pretty safe to say, right? It may be. We really don't know actually where the restaurants purchased the food from. They may purchase it from a local distributor who purchased it in interstate commerce. We just don't know. But let's assume that, in fact, one bag of chips was purchased as part of a case of chips by a restaurant, and then that case was broken apart, and all the chips were distributed one at a time to the restaurant's customers. Walling tells us that the flow of interstate commerce stops when it got to the local merchant. So even the bag of chips, even the can of soda that the plaintiffs are latching onto does not change things. The can of soda was taken from a case. It was purchased by the restaurant. Let's assume in interstate commerce. And then it was done. Its interstate journey ended, and it then went on to an intrastate journey. It got broken apart into 24 different meals that were delivered by 24 different drivers to 24 different diners in intrastate commerce. And so if we're going to use flow of goods, we still have to recognize that the flow of goods stops. This court has even said at some point you have to pick a point where the flow of goods in interstate commerce comes to an end, where the product comes to rest. And all of the cases say that if the employer, if the entity at issue that we're looking at, controls the interstate transportation from an out-of-state location into the state and then onto the customer, in Walling it said the customer's name was printed at the mill on the product, shipped to a warehouse, temporarily stored, and onto the customer, all in the chain of custody by the same entity. The court said the resting at the warehouse is not, it doesn't stop the flow of interstate commerce. But it contrasted that scenario with the scenario of an in-state purchaser, an in-state merchant who purchases the goods and then turns around and sells the goods to someone else, which is exactly our scenario here. The restaurant is the seller of the meal to the diner.  Or a can was taken out of a case and put into the bag along with the meal that was created from all of the ingredients. All of it came to rest in interstate commerce at the restaurant before moving on to the final customer. But I would argue also that the concept of flow of goods is actually not the test. This court in International Brotherhood said the worker, the class of worker, must actually be engaged in the transportation of the goods across state line. This court said that that is, in fact, the test. And we do not have to look at the flow of goods as part of the analysis. Section, in Circuit City, the court did reference flow of goods in interstate commerce, but it was in dicta regarding the application of the Clayton Act and what commerce meant in the context of the Clayton Act, not with respect to Section 1. In the DoorDash case, the plaintiffs made the same argument in that case. They said that drivers are involved in the flow of interstate commerce because they facilitate the transportation of goods that originated somewhere else before getting to the merchant. The district court in that case very properly said, although this would almost certainly be enough under the United States Constitution's Commerce Clause, the FAA is more narrow. And that's exactly right. We can use the flow of goods test, as many courts have done in other contexts, FELA, FLSA, Clayton Act, any time where Congress used the power of the word commerce to extend the reach of the statute to the fullest extent for the policy purpose of providing the broadest possible coverage. The courts have recognized that flow of goods is part of interstate commerce. The Third Circuit case that my colleague referred to, same thing. And that's why the supervisor gets pulled into this because the supervisor of the interstate workers is part of that, close enough essentially to be part of interstate commerce. All of those cases have their origins. If you look at the cases that were originally cited for that proposition that flow of goods applies, did not originate under the FAA. There were FELA cases and Fair Labor Standards Act cases and Clayton Act cases, et cetera. So the flow of goods does not apply here because Section 1 is designed to be a narrow exception, recognizing that Congress did not want to, again, arbitrarily exclude random classes of workers from arbitration because it had some arbitrary disdain for arbitration in certain undefined circumstances. Well, and moreover, the text of the statute itself says, you know, seamen, railroad employees, and any other class of workers engaged in commerce, which suggests that the workers themselves are doing, you know, workers engaged, which suggests it's the workers that are the transportation workers that all circuits focus on. Exactly right. And not just a worker, but the class of workers, as informed, again, by Congress's use of seamen and railroad employees. I have to say I'm still having trouble figuring out how you identify the class because it would seem to me that here the class is Grubhub employees, people who have this job, this delivery job. I think it is a challenge, and certainly in International Brotherhood, the court was focused on the employee subject to the collective bargaining agreement, but the statute itself, again, tells us that Congress was talking about industry-wide employment, industry-wide individuals who are engaged in railroad work or mercantile work. And so when we think about other classes of workers, we don't think this broad category of mercantile workers, this broad category of railroad workers, and then Grubhub delivery drivers, or Grubhub delivery drivers who happen to live in a town near a state border. That's not what Congress meant when it said what it said. It said class of workers. It didn't say class of employees employed by one employer. So it's an industry test? I think it's a test about the workers overall and the industry. It's informed. I mean, the Supreme Court has repeatedly instructed in looking at Section 1, and this court as well, that we look at the first two categories to understand the residual clause. And the first two categories are broad-brush, industry-wide workers. And why is that so? That's so because Congress was already taking care of those categories of workers through alternative dispute resolution protocols built into other statutes. Congress was protecting all seamen engaged in interstate commerce by virtue of another statute that provided dispute resolution. It wasn't providing dispute resolution protocols for all seamen who worked for a particular company. It was all of them as a class, regardless of whether they worked for a tiny company or a large company. And so here, if we're going to be informed by the first two elements of this clause, we have to look broadly, and we have to say local delivery drivers. You know, it's easy in cases that involve the trucking industry or that involve, say, like FedEx in the transport of goods via airline. Those industries are different, right? It's kind of difficult once you get out of those kind of mainline delivery, like, you know, on the channels of commerce, the focus of their job is that, to figure out how to define the class. Local delivery, you know, food delivery services. The difficulty there informs this court as to why it should affirm the judgment of the district court because when we look at when Congress has stepped in since 1925 to create alternative dispute resolution protocols, they did those same types of industries. They did airline, motor carrier. They were focused on those giant industries that are national in scope, that affect our economy on a nationwide basis, and where a mass strike by the workers engaged in that nationwide commerce would be crippling to our economy. But the court has never said that that's how you interpret that residual clause, mass strike or anything like that. And even though I agree with you that the purpose of the statute was to get at railroad workers and seamen because the alternative dispute resolution procedures were available in other statutes, we don't say that the residual clause is limited to those classes of workers who have alternative methods of dispute resolution made available in other statutes. That's true. I mean, it is an interesting quandary that in 1925, Congress left open the door for itself to create things, and even if they don't do it, the Section 1 exception would still apply. I think that's pretty well established. But I would say that the possibility of mass strikes and the rationale for Section 1's existence to begin with does need to be taken into account in determining whether a particular class of workers fits within the principles of statutory construction that make them like seamen and railroad workers. And I would submit that a local delivery person with a bag containing a sandwich and a bag of chips is not the type of worker that Congress would have envisioned being subject to the exemption. Such a person existed in 1925. Not necessarily in the Grubhub context. They probably didn't have an app, I imagine, which app, by the way, is why Grubhub qualifies under Section 2. It licenses an app nationwide. There's no doubt that Grubhub and its business and its contracts are involving commerce, notwithstanding my colleague's attempt to argue to the contrary. But, yeah, I definitely agree that there's some difficulty here with regard to the total breadth of Section 1's residual clause. But we have plenty of precedent, both from this circuit and from the U.S. Supreme Court, that says when in doubt, we construe this narrowly, that the first principles are that Congress has a liberal policy favoring arbitration, that the use of the term commerce in Section 2 was intended to grow and expand as our understanding of the commerce clause grew and expanded after 1925, and yet we have this limited exception that is designed to be very narrow, to be focused on a class of workers who like semen, who like railroad workers, are engaged in the bulk transfer of goods across state lines in interstate commerce. And plenty of cases, even Lentz considers whether a strike, they look at that as a factor, as a consideration in determining whether the employee fits within Section 1. And I would submit that this Court could easily do the same. Thank you. Thank you, Counsel. Thank you. Okay, a few quick points on rebuttal. I thought I had 3.30 remaining. So first of all, there's no question here that Grubhub is a transportation company. A federal court in California decided that after a bench trial, Lawson v. Grubhub. The question for Section 2 purposes is, does that transportation affect commerce? It only does if the food that's being delivered can be considered part of interstate commerce. So that's why I'm saying it's the same question here for the company under Section 2 as it is for the drivers under Section 1, and that's not always the case. I want to correct what my brother just said about the Teamsters case. The Teamsters case from this circuit does not say that the drivers must themselves cross state lines. It says that if drivers do cross state lines, they fall under Section 1 exemption. It doesn't say that they have to. And again, because this is considered as a 12B3 motion, the Court can make reasonable inferences. Just as your Honor said, that it's safe to say that some of the food that was being delivered would include things like chips and sodas. It can also be safe to say that some of the drivers, either the 7,000 or all delivery drivers for Grubhub or for the whole industry, this class of workers cross state lines at some point. On the flow of goods issue, again, I urge the Court to read the Dean Milk and the Scardino cases, which really addresses this issue. They use the same engaged, the Clayton Act uses the same engaged interstate commerce language as the FAA here, so they are on point. And I also want to point out one of the cases that was wrongly cited below, the C case, 2007 Westlaw 1518350. That was a case involving cooks at a Chinese food restaurant. And the Court there held that the food was an interstate commerce, even though food ingredients got processed and turned into Chinese food meals, that that food was an interstate commerce. There, however, the Court held under the FLSA that a cook was not engaged in interstate commerce because the cook wasn't actually engaged in the transport of that food, which is different from here where the drivers are clearly transportation workers, and that's not disputed. It's just that the cooks were not closely enough related. The Courts analyzed whether the cooks were serving customers who had traveled across state lines. That was the argument the plaintiffs made, and the Court analyzed that question, not the issue here. Also, in the Teamsters case, my brother was incorrect in saying that all of the drivers cross state lines only occasionally. That's not found in the decision. There was just discussion, as Your Honor pointed out. There was testimony from a couple of the drivers that they did occasionally cross into Indiana, and again on a 12b3 Stanford. The Court could infer that or remand for discovery on that point, although we agree with Grubhub that that would be a very strange way to interpret the statute and make it difficult to enforce if discovery had to be had on that issue in every case. Thank you, Counsel. Thank you, Your Honor. Thanks to both Counsel and the case is taken under advisement.